AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>Angel Philip Angulo Jr.,<br><br>Defendant | Case No. ED19-0023M |

FILED
CLERK, U.S. DISTRICT COURT
JAN 14 2019
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of October 3, 2018 and November 7, 2018, in the county of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Distribution of at least 50 grams of methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
_____
Complainant's signature

Paul Kirwan, Special Agent
_____
Printed name and title

Sworn to before me and signed in my presence.

Date: 1/14/19

City and state: Riverside, California

_____
Judge's signature

Hon. Shashi Kewalramani, U.S. Magistrate Judge
_____
Printed name and title

## AFFIDAVIT

I, Paul Kirwan, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against ANGEL PHILIP ANGULO, JR. ("ANGULO") for violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (distribution of at least 50 grams of methamphetamine).

2. This affidavit is also made in support of an application for a warrant to search the following digital device: a black LG Android Smart Phone, IMEI #351603102439839 (the "SUBJECT DEVICE"), in the custody of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") in Riverside, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. §§ 922(g)(1) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a Special Agent ("SA") with the ATF, and have been so employed since May 2017.

6.  I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. I am an ATF Interstate Nexus Expert, and routinely examine firearms and ammunition to determine their origins and travel in interstate commerce. During my time as an ATF SA, I have testified as an expert witness in federal court, participated on multiple different task forces, and assisted in multiple narcotics and firearms investigations. Based on my training and experience, and on my conversation with other ATF SAs, I am familiar with the investigation of federal firearms and drug crimes, and with the ways in which people who commit those crimes use their residences, vehicles, and digital devices to facilitate and conceal their activity.

## III. SUMMARY OF PROBABLE CAUSE

7.  On October 1, 2018, I executed a search warrant on a phone in another investigation and saw that a number that traced back to ANGULO was offering to sell firearms. On October 3, 2018, ANGULO sold an ATF undercover agent (the "UC")

approximately 102 grams of methamphetamine in Corona, California. On November 7, 2018, ANGULO sold the UC approximately 111 grams of methamphetamine in Riverside, California.

8.  On January 10, 2019, ANGULO was arrested pursuant to a state felony arrest warrant. Immediately prior to being arrested, ANGULO was sitting in the passenger seat of a Ford Mustang. After ANGULO was arrested, I found the SUBJECT DEVICE mounted on the passenger-side dashboard, in front of where ANGULO had been sitting.

## IV. STATEMENT OF PROBABLE CAUSE

9.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. ANGULO is Identified as a Firearms Source

10.  On October 1, 2018, I executed a federal search warrant on Gregory Yarde's personal cell phone. Yarde is charged in <u>United States v. Gregory Yarde</u>, Case No. CR 18-284-JGB, with violations of 21 U.S.C. § 841(a)(1) (distributing and possessing with intent to distribute methamphetamine) and 18 U.S.C. §§ 924(c)(1)(A)(i) (possessing a firearm in furtherance of a drug trafficking crime) and 922(g)(1) (prohibited person in possession of a firearm).

11.  During my search of Yarde's phone, I discovered text messages from August 2018 between Yarde and a contact listed as "Bullet," in which "Bullet" had sent Yarde multiple photographs of firearms in an attempt to sell the firearms to him. I know

3

from my investigation of Yarde that Yarde has been convicted of multiple felonies and is prohibited from possessing firearms.

12. There were two phone numbers stored for "Bullet" in Yarde's contact list: (951) 963-1734 and (951) 963-0365. In one of his text messages to Yarde, "Bullet" stated that (951) 963-0365 was his new number.

13. On October 2, 2018, I attempted to identify "Bullet" by querying the moniker "Bullet" and the phone number (951) 963-0365 in law enforcement databases. The query returned mugshots and other personal identifiers for ANGULO. I also contacted a confidential informant working for ATF (the "CI")[1], and inquired whether he/she knew anyone with the moniker "Bullet." The CI indicated that he/she knew a gang member in Corona who went by that name.

14. Once I had obtained a mugshot and Department of Motor Vehicle ("DMV") photograph of ANGULO, I showed the photographs to the CI. The CI indicated that the person in the photographs was the person the CI knew as "Bullet."

15. The CI also provided a phone number for "Bullet." The phone number the CI provided was (951) 963-0365, which matched the number from which "Bullet" was sending text messages to Yarde.

16. On October 2, 2018, I queried ANGULO's criminal history using law enforcement databases and learned that ANGULO

---

[1] The CI is being paid to assist law enforcement. The CI has convictions for at least the following crimes: theft offenses, drug offenses, and credit card and identity theft.

4

has been convicted of multiple felonies and is prohibited from possessing firearms and ammunition.

      **B.   ANGULO Sells the UC Approximately 102 Grams of Methamphetamine on October 3, 2018**

    17.   On or about October 3, 2018, at my direction, the CI set up a deal between ANGULO and the UC in which the UC would purchase four ounces of methamphetamine from ANGULO. The CI and UC agreed to meet ANGULO at a commercial parking lot in Corona, California (the "Corona parking lot") to conduct the transaction.

    18.   At approximately 3:40 p.m. on October 3, 2018, the CI and UC were waiting for ANGULO in the Corona parking lot in an unmarked, undercover ATF car when a white, four-door sedan with paper plates, tinted windows, and silver rims pulled up next to them. ANGULO got out of the white sedan and entered the front passenger seat of the ATF car. A female seated in the passenger seat of the white sedan did not get out of the car. When ANGULO entered the ATF car, the UC recognized him from mugshots and DMV photographs the UC had reviewed prior to the transaction.

    19.   Once inside the ATF car, ANGULO sold approximately four ounces of methamphetamine to the UC for $700. ANGULO handed the methamphetamine to the UC in a clear plastic bag. The transaction was audio recorded by the UC.

    20.   During the transaction, ANGULO and the UC discussed exchanging phone numbers for potential future drug deals. ANGULO told the UC that in the future, he/she could text ANGULO directly to arrange drug transactions.

21. After the controlled purchase with ANGULO, a Drug Enforcement Administration ("DEA") laboratory tested the methamphetamine ANGULO sold and confirmed that it was 100% pure methamphetamine and that its net weight was approximately 102 grams.

### C. ANGULO Sells the UC Approximately 111 Grams of Methamphetamine on November 7, 2018

22. On or about November 6, 2018, at my direction, the CI contacted ANGULO via text message to set up another deal for the sale of approximately four ounces of methamphetamine and potentially a firearm to the UC. On or about November 7, 2018, the CI and UC agreed to meet ANGULO at a commercial parking lot in Riverside, California (the "Riverside parking lot") to conduct the transaction.

23. At approximately 3:25 p.m. on November 7, 2018, the CI and UC were waiting for ANGULO at the Riverside parking lot in an unmarked, undercover ATF car when ANGULO arrived on foot and got into the passenger seat.

24. Once inside the ATF car, ANGULO sold approximately four ounces of methamphetamine to the UC for $700. ANGULO handed the methamphetamine to the UC in a black plastic bag. The transaction was audio and video recorded by the UC.

25. During the transaction, the UC inquired about purchasing a firearm from ANGULO. ANGULO was not willing to sell the UC a firearm. However, ANGULO indicated that he was considering purchasing a couple firearms from a source who had obtained the firearms from a gun range. ANGULO also mentioned

that he had just recently bought a "sub-compact" and was looking to purchase other firearms. I know from my training and experience that a "sub-compact" refers to a pistol or handgun that is smaller in size than a full-sized pistol or handgun. Because of their small size, sub-compacts are easier to conceal than other firearms. Also during the transaction, ANGULO asked the UC if he/she was interested in the "black," which is a term that is commonly used to refer to heroin.

26. After the controlled purchase, a DEA laboratory tested the methamphetamine ANGULO sold and confirmed that it was 100% pure methamphetamine and that its net weight was approximately 111 grams.

**D. ANGULO is Arrested on January 10, 2019 with the SUBJECT DEVICE**

27. On January 9, 2019, I queried law enforcement databases and learned that ANGULO had an active state felony arrest warrant under Riverside County Case Number RIF1804826 for violating California Penal Code section 29800(a)(1) (felon in possession of firearm) and California Health and Safety Code section 11378 (possession of controlled substance for sale).

28. After learning about the sate felony arrest warrant, and after also receiving information that ANGULO may be planning a robbery, I attempted to locate ANGULO at various locations that I know from my training and experience are frequented by Corona gang members. On January 10, 2019, I found an older Ford Mustang with a California license plate number 4TTZ258 ("the Ford Mustang") in the parking lot at the Tiffany Inn in Corona,

7

California.  Although the Ford Mustang was not registered to ANGULO, I believed ANGULO was using it because it matched the description and license plate number provided by the CI for ANGULO's car.

29.  After I saw the Ford Mustang in the Tiffany Inn parking lot, I reached out to officers from the Riverside County West Post-Release Accountability Compliance Team ("PACT") and requested assistance with apprehending ANGULO.  When the PACT officers arrived, they set themselves up in takedown positions around the parking lot so they could apprehend ANGULO when he left his motel room.

30.  Meanwhile, I went inside the Tiffany Inn and spoke with the motel manager.  I showed the manager a photograph of ANGULO and asked if ANGULO was staying at the motel.  The motel manager stated that ANGULO was in fact staying there, and that he was in room number 210.  Shortly after speaking with the manager, I saw ANGULO and a female exit motel room number 210 and walk down the stairs toward the Ford Mustang.  I recognized ANGULO from his mugshots and DMV photographs.  I also recognized him from the October 3, 2018 and November 7, 2018 drug transactions because I had been conducting surveillance of those transactions.

31.  ANGULO's female companion (later identified as Desiree Corona) entered the driver's side of the Ford Mustang.  ANGULO, who was carrying a small, black backpack, opened the front passenger door of the Ford Mustang and got inside.

8

32. PACT officers blocked the Ford Mustang from leaving the parking lot and arrested ANGULO pursuant to the state felony arrest warrant. Officers also detained Corona. In anticipation of frisking Corona, an officer asked if she had anything illegal on her person. Corona responded that she had drugs in her bra. The officer patted her down and discovered approximately four grams of suspected methamphetamine in a plastic bag in her bra.

33. Given the suspected methamphetamine found on Corona, ANGULO's felony arrest warrant, and the fact that ANGULO was contacted while inside the Ford Mustang, officers searched the Ford Mustang. During the search, I specifically searched the black backpack ANGULO was seen carrying, as well as his immediate lunging area, for any contraband. The backpack, which was on the floor in front of the passenger seat, contained a mask, a beanie with fake hair, gloves, bolt cutters, tools, and zip ties.

34. The SUBJECT DEVICE was mounted in plain view on the passenger-side dashboard of the car. The SUBJECT DEVICE was placed in front of where ANGULO was sitting inside the car. I asked Corona if the SUBJECT DEVICE belonged to her, and she said it did not.

35. When issuing Corona a citation for possessing a controlled substance, one of the PACT officers obtained Corona's phone number from Corona and dialed it. In response, a cell phone mounted on the driver-side dashboard of the Ford Mustang rang. The SUBJECT DEVICE did not ring.

36. Following the search of the Ford Mustang and motel room number 210, ANGULO was booked into the Riverside County Jail on the state felony arrest warrant. The SUBJECT DEVICE was taken into ATF custody. ANGULO was not interviewed at the scene or at the jail.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

37. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds. Drug trafficking is also often dangerous, and thus drug traffickers, particularly those who already own or have access to firearms, often possess and carry firearms in furtherance of their drug trafficking activities in order to, for example, protect drugs and drug proceeds from theft.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained

where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

  c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

  d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

### VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

38. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

  a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as

11

items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.  Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these

photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

39. As used herein, the term "digital device" includes the SUBJECT DEVICE.

40. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    41.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel

may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

   42. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

        c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to: (1) depress ANGULO's thumb- and/or fingers on the SUBJECT DEVICE; and (2) hold the SUBJECT DEVICE in front of ANGULO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

43. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//
//
//
//
//
//
//
//
//
//
//
//

## VIII. CONCLUSION

44. For all of the reasons described above, there is probable cause to believe that ANGULO violated 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

/S/
_____
Paul Kirwan, Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed to and sworn before me this 14TH day of January, 2019.

_____
UNITED STATES MAGISTRATE JUDGE
SHASHI H. KEWALRAMANI

17